# UNITED STATES DISTRICT COURT
# DISTRICT OF VERMONT

GLORIA AND CHRISTOPHER FLINN, )
                      Plaintiffs )
                                )
v.                              )
                                )
                                )
BANK OF AMERICA CORPORATION )
                      Defendant )

Civil Action No. 5:15-cv-193
**JURY TRIAL DEMANDED**

BY _____
2015 SEP -1 AM 9:31
DEPUTY CLERK   CLERK
U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

## COMPLAINT

### Nature of Action

1.      This is an action for the sale of securities generally known in the financial industry as Exchange Traded Notes (ETNs).  ETNs are unsecured notes issued by underwriting banks that promise to pay at maturity the value of the notes determined by a benchmark index, less certain fees.  ETNs are classified as highly complex products by the Financial Industry Regulatory Authority, Inc. (FINRA), a self-regulatory organization in the financial industry. The first ETN was offered in 2002.

2.      Starting in 2009 ETNs linked to future volatility indexes were offered.  These indexes measure the implied volatility associated with market futures and options which in turn reflect investor anxieties due to economic and political changes.   In theory, the value of these ETNs over the course of their term is linked to the performance of a volatility index. Because volatility is negatively correlated with equity markets, ETNs may act as hedge against market downturns.  ETNs are marketed as a feature of an investor's balanced portfolio.

3.      In Spring 2010, Bank of America introduced a volatility index it had created, the Investable Volatility Index (IVI).  IVI was to provide a benchmark for investing in equity market volatility.  Bank of America offered ETNs that it called Strategic Return Notes (SRNs) linked to IVI.  Plaintiffs purchased $200,000 of SRNs on September 22, 2010, with a maturity date of September 25, 2015; they made additional purchases of SRNs in 2012.

4.      The SRNs sold to plaintiffs have structural or design features that are *not* disclosed by Bank of America, and virtually guarantee the values of the SRNs will go to zero or are substantially diminished by maturity.  With the exception of periods of sustained and significant market downturns which are historically rare, SRNs operate to allow a steady transfer of investors' funds to the coffers of Bank of America.  In order for an investor to recoup the purchase price of SRNs in 5 years, the economy must experience such catastrophic losses that will likely put the viability of financial institutions like Bank of America in serious question.  Practically speaking, Bank of America took investors' monies with the intention not to repay.

5.      In order to induce sales of SRNs and generate millions of dollars in profits, Bank of America manipulated the information and data given to consumers on the performance of the SRNs.  This deceptive practice gave consumers such as plaintiffs the false impression that the SRNs will likely retain their value during stable market conditions while providing protection against market decline.  As a result of Bank of America's scheme, consumers who purchased SRNs including plaintiffs have lost much if not all their investments.  On information and belief, in 2011 Bank of America stopped issuing new SRNs.

## Parties

6 .     Plaintiffs at all relevant times herein were and continue to be residents of Burlington, Chittenden County, State of Vermont.

7.     At all relevant times Bank of America Corporation ("Bank of America") was a Delaware corporation, authorized to engage in business in the State of Vermont, with its principal place of business in Charlotte, North Carolina.

## Jurisdiction and Venue

8.     This Court has federal question (28 U.S.C. §1331), and diversity jurisdiction (28 U.S.C. § 1332) as there is diversity of citizenship between plaintiffs and defendants and the amount in controversy exceeds $75,000.

9.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2).

## Facts

10.     In 2005 plaintiffs opened an investment account with Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch").  The representatives of Merrill Lynch who were dealing with plaintiffs were Rich Kowalski and George Ewins (collectively referred to as "Advisors").  At all relevant times herein, Merrill Lynch was a wholly owned subsidiary of Bank of America, and Merrill Lynch and the Advisors were acting as agents of Bank of America.

11.     In September 2010, Rich Kowalski told plaintiffs about a new product offered through Merrill Lynch that was designed to provide principal protection and that they would give up some upside for protection on the downside (the "New Product").  The Advisors provided plaintiffs with a publication by Bank of America entitled "Investable Volatility

Index" to describe the New Product.  The publication is undated but it appears to have been published in August 2010.  At a subsequent meeting before September 22, 2010, the Advisors may have provided another Bank of America publication entitled "Why invest in volatility? Efficient diversification and crash protection" dated July 30, 2010.

12.     On or about September 22, 2010, Rich Kowalski called plaintiff Gloria Flinn and stated that if plaintiffs wished to invest in the New Product, they had to commit that day. At the recommendation of Rich Kowalski, plaintiffs invested $200,000 in the New Product.

13.     The New Product was purchased on September 22, 2010.  The trade confirmation issued by Merrill Lynch described the purchase as: "BAC STAT RET NTES VOL SV=TBD VOLATILITY INDX DUE SEPTEMBER 25, 2015."  The purchase was for 20,000 units at $10 per unit for a total of $200,000.00

14.     On September 23, 2010, Rich Kowalski emailed to plaintiff Gloria Flinn a link to a website that listed the various products offered through Merrill Lynch to learn more about the New Product.  Plaintiff Gloria Flinn emailed back to inquire which of the listings was the New Product.  Rich Kowalski responded by stating in part: "It's the investable volatility note."

15.     The Note and prospectus for the New Product was provided to the plaintiffs in October 2010.  It identified the product as "Bank of America Corporation Medium-Term Notes, Series L Strategic Return Notes Linked to the Investable Volatility Index, due September 25, 2015 (the "SRNs")."  The ML symbol was MLGFO.  The document was supplemented on September 29, 2010, and indicated 6,511,021 units were issued as a public offering which after an underwriting discount yielded Bank of America the sum of $63,808,005.80.

16.     Over the course of the ensuing year, the periodic statements provided to the plaintiffs showed their SRNs (MLGFO) sustained significant unrealized losses.  The losses were unrealized in the sense that plaintiffs had not actually sold any of the SRNs.

17.     Not knowing that the SRNs were essentially rigged to lose value, plaintiffs in 2012 decided to mitigate by purchasing more SRNs.  As the prices for the SRNs had dropped well below $10 per unit, by purchasing more SRNs, plaintiffs expected the average cost of all the SRNs purchased by them would be lower than $10 per unit. Plaintiffs believed their lower average cost would allow for recouping their losses once the performance of the SRNs improved.  Plaintiffs had to purchase resales of SRNs as Bank of America had stopped issuing new SRNs in early 2011.

18.     The Advisors provided plaintiff with another copy of "Why invest in volatility? Efficient diversification and crash protection" and another Bank of America publication entitled "What if the VIX rises?"  Plaintiffs made the following additional purchases of SRNs from Bank of America:

    a.  May 14, 2012, 5040 units at $4.48 per unit for a total of $22,624.00,
        ML Symbol MLVOL, initially issued October 28, 2010, supplemented
        November 3, 2010, with a public offering of 3,632,274 Units with net
        proceeds of $35,596,285.20 to Bank of America,

    b.  July 20, 2012, 5000 units at $3.811 per unit for a total of $19,055.35,
        ML Symbol MLVTL, initially issued January 27, 2011, supplemented
        February 2, 2011, with a public offering of 1,389,778 Units with net
        proceeds of $13,619,824.40 to Bank of America, and

    c.  November 6, 2012, 2500 units at $3.6921 per unit for a total of
        $9,230.35, ML Symbol MLVTL, initially issued January 27, 2011,
        supplemented  February 2, 2011, with a public offering of 1,389,778
        Units with net proceeds of $13,619,824.40 to Bank of America.

The SRNs purchased in 2012 had prospectuses which were substantially similar if not identical to the one for the 2010 purchase.

19.     In October 2013 after experiencing steady unrealized losses with all their SRNs, and after having been told by the Advisors that the recommendation was to "hold," Gloria Flinn came across an article dated October 18, 2013, in Barron's entitled "VIX Creator: Volatility ETPs 'Virtually Guaranteed to Lose Money.'" VIX was the first volatility index introduced in 1993.  This discovery led to efforts by plaintiffs to understand the mechanism and behavior of SRNs, and the conclusion alleged in this complaint that they were misled and the victims of fraud by Bank of America.

20.     On June 16, 2015, plaintiffs demanded rescission from Bank of America. Bank of America declined to respond.

## COUNT I
### (Rescission Pursuant to Securities Exchange Act of 1934)

21.     Plaintiffs incorporate and reallege paragraphs 1-20.

22.     The SRNs meet the definition of "security" under section 3(10) of the Securities Exchange Act of 1934 as amended (the "Exchange Act").

23.     Bank of America meets the definition of "person" under section 3(9) and "issuer" under section 3(8) of the Exchange Act.

24.     The Exchange Act, section 10(b) as amended, 15 U.S.C. §78j, and Rule 10b–5 promulgated pursuant to the Exchange Act, 17 C.F.R. §240.10b–5, make it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

25.     The promotional material given to plaintiffs before the purchase of SRNs on September 22, 2010, *namely,* "Investable Volatility Index" likely published in August 2010, and "Why invest in volatility? Efficient diversification and crash protection" dated July 30, 2010, and the prospectuses (collectively referred to as "Bank of America Publications") contain the following material omissions which are italicized below for ease of reference:

a.     Bank of America omitted to disclose that long term the expected value of SRNs is zero.

The following disclosure should have been made in Bank of America's Publications:

*The long term expect value of your SRNs is zero. If you hold your SRNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment.*

b.     Bank of America omitted to disclose the mechanism for the constant erosion of the principal invested.

The following disclosure should have been made in Bank of America Publications. For example in "Investable Volatility Index" under the section "Index Mechanics":

Index Mechanics

.          .          .

The Index measures the forward implied volatility of the S&P 500 Index for a three-month window centered approximately five months in the future, and the Index return reflects transaction costs associated with rolling a hypothetical position to maintain this exposure. *In*

*addition to the transaction costs, every time your hypothetical position is rolled, you will likely have an unrealized loss which in combination may result in the loss of as much as one-third of your principal investment in the first year.*

c.   Bank of America omitted to disclose that the data used to show the "historic" performance of IVI was favorably manipulated.

The following disclosure should have been made in Bank of America Publications. For example in "Investable Volatility Index" under the section "Using the Index to Hedge an Equity Portfolio":

The Index may offer powerful diversification to equity portfolios. On a historical basis, even small hypothetical allocations to the Index significantly improved performance by reducing risk and increasing risk-adjusted returns. *The historical basis for the graph on this page is for the period of 12/31/04 through 9/22/10. During this period of approximately 69 months, the S&P 500 dropped 11 times by more than 5% in a day. To place this in historic context, since 1950 there have been 23 drops of more than 5% in a day. In other words, nearly 48% of S&P 500 drops of more than 5% in a day took place during the period we have chosen for our analysis, and this favors the performance of the Index. The analysis of the historic performance of IVI will be significantly different by expanding the time frame to reflect a broader horizon of market behavior, and is likely to show that a hypothetical allocation to the Index will create a negative drag on the gains from other investments in your portfolio.*

d.   Bank of America omitted to disclose that because of erosion of capital, the potential for reduction of large losses is unrealistic.

The following disclosure should have been added in Bank of America Publications. For example in "Investable Volatility Index" under the section "Reduced Potential for Large Losses":

The Index may help to moderate a portfolio's return distribution, thus reducing the occurrence of large losses. *However, historically large losses occur infrequently which means that a long term investment linked to the Index will erode principal to the point that even if a large loss does occur during the term of your investment, the Index gains will be minimal and unlikely to moderate a portfolio's return distribution.*

26.     The omissions alleged in the preceding paragraph are common to Bank of America Publications made available to the plaintiffs for the SRNs they purchased.  The true facts existed at the time of the omissions and should have been disclosed.

27.     The omissions were of material facts which were necessary to make the statements contained in Bank of America Publications not false and misleading.  A reasonable investor would have considered the omissions by Bank of America important in making the decision whether to purchase SRNs.   The omissions were of such significance that a reasonable investor with knowledge of same would have declined to purchase SRNs.

28.     But-for the omissions, Bank of America would not have been able to sell SRNs to the public at large including the plaintiffs.  No reasonable investor would make a long term investment that was virtually guaranteed to lose all its value.  Had Bank of America made the alleged disclosures and facilitated a true understanding of the SRNs, no reasonable investor including the plaintiffs would have purchased SRNs.

29.     The representations in Bank of America Publications as well as the representations by Advisors as agents of Bank of America that SRNs linked to IVI offered a reasonable volatility component for a balanced investment portfolio, were a substantial factor in plaintiffs' decision to purchase SRNs from Bank of America.  Plaintiffs reasonably relied on the representations by Bank of America. Plaintiffs also relied on the reputation, integrity and expertise of Bank of America and its agents to not sell an investment tool that was designed to transfer their money to Bank of America in exchange for nothing.  It was reasonable for the plaintiffs not to even suspect that an institution like Bank of America would simply rob them in daylight.

30.     Bank of America had the required element of scienter.  By the time plaintiffs purchased SRNs in September 2010, Bank of America knew the mechanism for the SRNs linked to IVI was virtually guaranteed to cause its long term investors to lose their entire investment to Bank of America.  Bank of America took its customers' money under a scheme that was rigged by it to keep the money.

31.     Bank of America knew (i) the futures price curve was consistently upward, (ii) the duration of any negative slopes was much shorter than positive slopes, (iii) the mechanism of the SRNs with a rolling hypothetical position would substantially erode the principal, (iv) historically there was no likelihood of a sustained market decline to yield a positive volatility linked return for five years, and (v) the forecast was for positive market growth.

32.     Bank of America knew that if it had disclosed that the SRNs were likely to lose their value to zero or close to zero by maturity, no one would buy them.  Bank of America had the motive to enrich itself by millions of dollars which generated bonuses and financial benefits to its key personnel.

33.     With the 2008 extraordinary market downturns, there was an opportunity for Bank of America to manipulate the market performance data to promote and sell SRNs to investors who were eager for protection against market downturn.  The opportunity to help itself to its customers' money was enhanced by Bank of America's introduction of a new benchmark, the IVI, and the SRNs, which in turn allowed for aggressive marketing to hustle customers like plaintiffs into making purchases.

34.     At a minimum, Bank of America was severely reckless in making the omissions alleged herein as it had all the historic data and information to show that the SRNs would lose

money and in the long term their value would approach zero. Yet Bank of America presented the data in a way to obscure the truth and thereby mislead its customers.

35.     On March 23, 2012, one of Bank of America's competitors, Credit Suisse, made the following disclosure in it prospectus for ETNs:

> The long term expect value of your ETNs is zero. If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment.

36.     The disclosure by Credit Suisse was made before the purchases of SRNs by plaintiff starting in May 2012. As evidence of Bank of America's scienter, it did not include such a disclosure in an amended prospectus for the sale of SRNs in 2012, and it failed to notify plaintiffs relative to their 2010 purchase. Bank of America failed to amend its prospectus and failed the notify customers like plaintiffs despite the fact that the value of SRNs from September 2010 to March 2012 had dropped sharply (by 65% for plaintiffs). Bank of America knew that the disclosure of the truth would create a number of problems for it including but not limited to the risk of a regulatory order of disgorgement and the crash of the resale market of SRNs.

37.     Plaintiffs were harmed as a result of Bank of America's fraudulent scheme and course of business which caused them to lose nearly all their investment. In December 2014, plaintiffs sold 3500 Units at 57 cents each for a loss of $33,005—a 94% loss of the original investment. The value of the Units are currently below a dollar each despite a significant market correction in August 2015. The harm sustained by plaintiffs was reasonably foreseeable as a result of Bank of America's conduct.

38.     Plaintiffs seek rescission of their purchases of SRNs from Bank of America. Plaintiffs tendered, and are prepared to again tender their Units to Bank of America for the return of the consideration they paid at the time of purchase.   Bank of America has and continues to refuse plaintiffs' offer of rescission.

WHEREFORE, plaintiffs seek judgment against defendant Bank of America for rescission, interest, costs and such further relief as may be appropriate.

## COUNT II
### (Damages Pursuant to Securities Exchange Act of 1934)

39.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-37.

40.     Alternatively plaintiffs seek the full extent of damages and recovery allowed under the Exchange Act including but not limited to compensatory damages, interest, and costs.

WHEREFORE, plaintiffs seek judgment against defendant for an award of compensatory damages, interest, costs and such further relief as may be appropriate.

## COUNT III
### (Rescission Under Vermont Law)

41.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-38.

42.     Bank of America's material omissions of fact were misleading and constitute grounds for rescission under Vermont common law.   Accordingly plaintiffs seek rescission and the return of the sums they have paid Bank of America together with interest at Vermont's statutory rate of 12%.

WHEREFORE, plaintiffs seek judgment against defendant for rescission, interest at legal rate of 12% under Vermont law, interest, costs and such further relief as may be appropriate.

**COUNT IV**
**(Fraud Under Vermont Law)**

43.    Plaintiffs reallege and incorporate the allegations in paragraphs 1-37, 40.

44.    Bank of America's conduct constitutes fraud under the common law of Vermont.  Bank of America had a duty to disclose the information alleged herein which was material and omitted from Bank of America Publications and/or the interactions of its agents/Advisors with plaintiffs.  The Advisors had a fiduciary relationship with the plaintiffs. The omitted information was not known to the plaintiffs.   Bank of America ratified the conduct of its Agents.

45.    Had the plaintiff been aware of the truth and complete disclosure, they would not have purchased the SRNs from Bank of America.   As a result of Bank of America's willful conduct, plaintiffs suffered damages including the substantial loss of their investment and consequential damages.

WHEREFORE, plaintiffs seek judgment against defendant for compensatory damages, punitive damages, interest, costs and such further relief as may be appropriate.

**COUNT V**
**(Punitive Damages)**

46.    Plaintiffs reallege and incorporate the allegations in paragraphs 1-37, 40, 44-45.

Cleary Shahi & Aicher
P.O. Box 6740
Rutland, VT 05702-6740

(802) 775-8800

13

47.     Bank of America engaged in wrongful conduct that was outrageously reprehensible, and acted with malice—bad motive, ill will, a criminal state of mind, and/or with reckless disregard of the rights of the plaintiffs.  As a result of its fraudulent scheme, Bank of America generated millions of dollars in revenues and profits.  The elements of malice are inherently part of the actual fraud committed by Bank of America.  An award of punitive damages to punish Bank of America and deter others from engaging in such conduct is appropriate.

WHEREFORE, plaintiffs seek judgment against defendant Bank of America for punitive damages in an amount to be determined by the jury, costs, and such other relief as may be appropriate.

### COUNT VI
### (Negligent Misrepresentation Under Vermont Law)

48.     Plaintiffs reallege and incorporate the allegations in paragraphs 1-37, 40.

49.     Bank of America failed to disclose to plaintiffs the information it knew would have caused the plaintiffs to refrain from purchasing the SRNs.  Bank of America had a duty to plaintiffs to exercise reasonable care to disclose the information.  Bank of America's duty to disclose included matters that it knew were necessary to prevent its partial or ambiguous statements from being misleading.  Bank of America's duty to disclose included subsequently acquired information that it knew made false or misleading a previous misrepresentation that it believed when made was true.  Bank of America's duty to disclose included facts basic to the transaction of sale of SRNs which Bank of America knew the plaintiffs were under a

mistake as to them and based on its relationship with the plaintiffs they would reasonably expected disclosure.

50.    As a result of the negligent misrepresentation by Bank of America, plaintiffs have suffered damages including the loss of substantial value of their investments in the SRNs and have suffered other damages.

WHEREFORE, plaintiffs seek judgment against defendant Bank of America for compensatory damages, statutory interest at 12%, interest, costs and such further relief as may be appropriate.

## COUNT VII
## (Unjust Enrichment Under Vermont Law)

51.    Plaintiffs reallege and incorporate the allegations in paragraphs 1-37.

52.    Plaintiffs conferred a benefit on defendant Bank of America by payment of the purchase prices for the SRNs.  Bank of America accepted the payments, and retained them under such circumstances that it would be inequitable for Bank of America to retain the ill-gotten gains by not returning the purchase prices to plaintiffs.

53.    Bank of America was unjustly enriched by its continued possession of funds illegally taken from investors.  In equity and good conscience, those funds should be returned to the victims of Bank of America's fraudulent scheme.

WHEREFORE, Plaintiffs seek an award against Bank of America for repayment of the amounts paid for purchases of SRNs with interest at Vermont's statutory rate of 12%, cost and such further relief as may be awarded.

## COUNT VIII
## (Consumer Fraud)

54.    Plaintiffs reallege and incorporate the allegations in paragraphs 1-37.

55.    Bank of America's acts and/or omissions constitute violations of Vermont Consumer Fraud Act, 9 V.S.A. §2453 which prohibits unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.

WHEREFORE, plaintiffs seek an award against Bank of America of damages, compensatory and punitive, to the maximum extent allowed by law, together with attorneys' fees and costs, and such other relief as may be appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury.

Dated this 1st day of September, 2015.

CLEARY SHAHI & AICHER, P.C.

By _____
        Kaveh S. Shahi, Esq.
        Attorney for Plaintiffs
        Gloria and Christopher Flinn

Cleary Shahi & Aicher
P.O. Box 6740
Rutland, VT 05702-6740

(802) 775-8800

16