UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 MAR 30 AM 9: 05

CLERK

BY _____
DEPUTY CLERK

GLORIA FLINN and CHRISTOPHER )
FLINN,                        )
                              )
        Plaintiffs,           )
                              )
    v.                        )    Case No. 5:15-cv-193
                              )
BANK OF AMERICA CORPORATION,  )
                              )
        Defendant.            )

## OPINION AND ORDER ON MOTION TO DISMISS
(Doc. 8)

Plaintiffs are a married couple who invested in a derivative security created by

Defendant Bank of America Corporation ("BOA").  Between September 2010 when

Plaintiffs first purchased the securities and December 2014 when they sold a portion of

their investment, they lost a substantial amount of money.  As of September 1, 2015, they

continued to hold the remainder of their purchase, which had greatly declined in value.

They seek rescission and compensatory and punitive damages on a variety of claims

including federal and state-law claims of fraud.  (*See* Doc. 1.)

BOA has moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6).  The

court heard argument on the Motion on January 13, 2016.  For the reasons that follow,

BOA's Motion to Dismiss (Doc. 8) is DENIED.

## Background

In setting out the facts, the court relies on the allegations of the Complaint

supplemented by the offering documents which are attached to the Motion to Dismiss and

explicitly mentioned in the Complaint, as well as material that may properly be noticed.

The authenticity of the offering documents is not disputed.[1]  They include a
September 29, 2010 Supplement and 29-page Final Pricing Supplement (Doc. 8-3); a
three-page description of the Investable Volatility Index (Doc. 8-4); and a 21-page
promotional document or "primer" entitled "Why invest in Volatility?" dated July 30,
2010 (Doc. 8-5).

## I.    Strategic Return Notes Linked to the Investable Volatility Index

In 2010 BOA developed a securities product which it called a Strategic Return
Note ("SRN").  (Doc. 1 ¶ 3.)  The SRNs were offered to investors as a hedge against
declines in the equity market as reflected in increases in market volatility.  (*Id.*)  In order
to price and administer the SRNs, BOA created a daily index which it called the
Investable Volatility Index ("IVI" or "Index").  (*Id.*)  The price of the SRNs was
determined mainly by the level of the IVI.[2]

Volatility is a measurement of the rate at which prices change over time.  It is
similar to acceleration in the world of physical bodies.  Prices which change very slowly
from day to day or month to month have a low rate of volatility.  Prices which drop or
rise very quickly have a high rate of volatility.  In the case of the SRNs at issue here, the
IVI measures volatility in the equity futures market by comparing reported prices for a
broad-based index of equity futures contracts located over a spread of three months with
a midpoint five months from the current date.  If the change in prices over time is low,

---

[1] There is a dispute about which of the offering documents the court should
consider when evaluating what BOA disclosed to Plaintiffs.  The court addresses that
issue below.

[2] The SRNs are therefore "derivative instruments."  They are financial
instruments "whose value depends on or is derived from the performance of a secondary
source."  *Derivative*, Black's Law Dictionary (10th ed. 2014).  The secondary source in
this case is the IVI.

volatility (the rate of change) will be low.  If futures prices rise or fall greatly, volatility

will be high.

Although volatility only describes the rate of price change without regard to

direction, economists have noted that volatility measures tend to increase at times of

market decline.  (*See* Doc. 8-5 at 3 & n.5 (noting that "volatility tends to rise most

sharply when equity markets are under significant stress").)  For this reason, a security

whose value rises with increased volatility may be seen by an investor as an asset whose

price rises when his or her equity portfolio decreases.  Such an investment may operate as

a hedge against stock market losses, and the parties agree that BOA marketed the SRNs

on this basis.

The creation of the IVI is described in detail at pages 15–18 of the Final Pricing

Supplement (Doc. 8-3 at 18–21).  The summary that follows does not do full justice to

the mathematics involved in computing the IVI, but it describes the general process

which appears in the offering documents.[3]  In understanding the IVI, the starting point is

that as in the case of many derivative indices, it is purely synthetic; it does not reflect the

value of an asset owned by an investor.  It is a daily value derived from prices for future

options which are reported on a daily basis by the Chicago Board Options Exchange

("CBOE").[4]  It is not a bundle of securities or other assets like a mutual fund.  In creating

the IVI, BOA neither buys or sells anything, and it holds no assets on behalf of the

purchasers of the SRNs.

_____

[3] The precise process for calculating the value of the IVI is set forth in detail in
Annex A of the Final Pricing Supplement.  (Doc. 8-3 at 33–35.)

[4] The CBOE is "[t]he predominant organized marketplace in the United States for
trading options. *Chicago Board Options Exchange*, Black's Law Dictionary (10th ed.
2014).

The next step towards understanding the IVI is to understand its purpose.  The Final Pricing Supplement describes it in this way: "The Index is designed to measure the return of an investment in the forward implied volatility of the S&P 500® Index."  (Doc. 8-3 at 18.)[5]  "Volatility" is a "statistical measure of the variability in the price of [an] asset over a period of time."  (Doc. 8-3 at 18.)  One dictionary definition of volatility is:

> An extreme fluctuation in price that affects a stock, bond, or other financial instrument and is usually accompanied by unusually high trading volume.  Volatility is caused by expectations of poor earnings, unexpected bad news from some other company in the industry, or external events, such as expectations of a war or political turmoil.  Poor economic data or bearish comments from Federal Reserve officials also can cause volatility.

*Webster's New World Finance and Investment Dictionary* 344 (2003).

The "implied" volatility of an option "is a market measure related to the volatility of the underlying asset from that current day to the option's expiration."  (Doc. 8-3 at 18.)[6]  It is prospective—not historical—and reflects the predictions and expectations of investors who trade in stock market option contracts during the selected period.  In other words, implied volatility is "[a]n estimate of the expected volatility of the security that an option is based upon, determined by the price, or premium, of the option."  *Webster's New World Finance and Investment Dictionary* 167 (2003).  "Factors affecting implied volatility are the exercise price of the options, the risk-free rate of return, the option's maturity date, and the price of the option."  *Id.*

_____

[5] The S&P 500 Index is a "capitalization-weighted index of 500 stocks" that is often used "to measure the performance of the large cap[italization] U.S. stock market." *Webster's New World Finance and Investment Dictionary* 287 (2003).

[6] In contrast to implied volatility, a measure of realized volatility would measure the volatility actually experienced at the current date.   An investor who exercises an option to buy or sell stock experiences realized volatility.  The IVI seeks to measure something different—the expectation of the market participants measured by the relative prices of options for three successive quarterly dates in the future.

"Forward" implied volatility "is a market measure related to the volatility of the underlying asset between two dates in the future." (Doc. 8-3 at 18.)  "The Index measures the forward implied volatility of the S&P 500® Index for a three-month period, the mid-point of which is approximately five months in the future." (*Id.*)  The IVI measures the rate of change in option prices within the three-month window selected by the creators of the IVI.  The rate of change is recalculated each day as new options prices are added ("bought") at the most remote time and the most recent prices drop out of the Index ("sold").  The IVI is purely synthetic—it holds no options contracts—but it is intended to mimic the experience of an investor who holds a wide range of S&P 500 futures spanning the three-month "forward" period.

The level of the IVI is the result of holding a "theoretical portfolio" of forward implied volatilities computed from the Index Components. (*See id.*)  "This portfolio is rebalanced on a daily basis to approximate the forward implied volatility of the S&P 500® Index for a three-month period, the mid-point of which is approximately five months in the future." (*Id.*)  Inspection of the process for calculating the IVI reveals that, the level of the IVI on each day depends on the previous day's level plus a return on that level. (*See* Doc. 8-3 at 34.)  The return is positive if the weighted sum of forward implied volatilities has increased, and is negative if the weighted sum of forward implied volatilities has decreased. (*See id.*)[7]

---

[7] The mathematics of the rebalancing are described in the offering documents. Basically, if today's forward implied volatilities are greater than yesterday's, the return will be positive.  If today's forward implied volatilities are less than yesterday's, the return will be negative.  As the equation for the IVI's closing level makes clear, each day's level depends in part on the product of the previous day's level and the return.

## II.    Fee Structure

The SRNs came with two types of fees: a one-time 2% "sales charge" and an annual "Index Adjustment Factor."  Both of those fees appear in the calculation of the redemption or exchange amount for the SRNs.  (*See generally* Doc. 8-3 at 5–6.)  The SRNs are sold in units at $10.00.  The exchange or redemption amount of each SRN is $9.80 times the "Adjusted Ending Value" divided by the "Starting Value."  The "Starting Value" of the Index is the average of the closing levels of the Index on the first five "Calculation Days" shortly before the settlement date of the SRNs.  The "Adjusted Ending Value" is the average of the closing levels of the Index, reduced by the "Index Adjustment Factor," on five days during a period shortly before maturity or exchange. The $9.80 figure in the equation reflects the 2% "sales charge."

The "Index Adjustment Factor"—also referred to as the "holding," "roll," or "carry" cost—is defined as "[a] daily reduction of 0.75% per annum, calculated each calendar day on and after the last day of the Initial Determination Period that will be applied and accrue daily (on the basis of a 365 day year) against the level of the Index." (*Id.* at 6.)  As a result of the cumulative effect of the "Index Adjustment Factor" over the five-year term on the SRNs, "the level of the Index shortly before the stated maturity date, as reduced by the accrued Index Adjustment Factor, will be approximately 3.67% lower than the level of the Index reported by the CBOE (which does not include this reduction)."  (*Id.* at 22.)  As a result of both of the fees, the level of the Index would have to increase by more than 5.93% from the Starting Value in order for the investor to receive at least the $10 original offering price upon maturity, five years after purchase of the SRNs.  (*Id.* at 5.)

### III.     Plaintiffs' SRN Investments

The SRNs were first offered in 2010.  In September 2010, Plaintiffs' broker at

Merrill Lynch told them about a new product "designed to provide principal protection"

under which Plaintiffs "would give up some upside for protection on the downside."

(Doc. 1 ¶¶ 10–11.)[8]  On or about September 22, 2010, the broker called Plaintiff Gloria

Flinn and stated that if Plaintiffs wished to invest in the new product, they had to commit

that day.  (*Id.* ¶ 12.)  At a cost of $10 per unit, Plaintiffs invested $200,000 for 20,000

units of SRNs.  The "Starting Value" for the Index was 281.69.  (Doc. 8-3 at 2.)

These SRNs had a five-year redemption period.  Like other buyers, Plaintiffs were

permitted to redeem the SRNs at quarterly intervals.  They could also resell on the

secondary market at any time.  By March 2012 the value of Plaintiffs' SRNs had dropped

by 65%.  (Doc. 1 ¶ 36.)  Later in 2012, Plaintiffs invested an additional $50,909.70 to

purchase 12,540 more units.[9]  (*See id.* ¶ 18.)  Because BOA stopped issuing new SRNs in

early 2011, Plaintiffs' 2012 transactions were purchases of resales.  (*Id.* ¶ 17.)

In October 2013, Plaintiff Gloria Flinn came across an October 18, 2013 story in

*Barron's* entitled "VIX Creator: Volatility ETPs 'Virtually Guaranteed to Lose Money.'"

(*Id.* ¶ 19.)[10]  The *Barron's* story referred to a forthcoming paper by Robert E. Whaley—

_____  _____  _____

   [8] At all relevant times, Merrill Lynch was a wholly-owned subsidiary of BOA,
and Merrill Lynch and Plaintiffs' broker were acting as agents of BOA.  (*Id.* ¶ 10.)

   [9] On May 14, 2012, Plaintiffs purchased 5,040 units at $4.48 per unit; on July 20,
2012, they purchased 5,000 units at $3.811 per unit; and on November 6, 2012, they
purchased 2,500 units at $3.6921 per unit.

   [10] The VIX is a measure of implied volatility; it "measures traders' expectations
of volatility in the stock market by tracking bid/ask quotes on the Standard & Poor's 500
Stock Index."  John Downs & Jordan Elliot Goodman, *Dictionary of Finance and
Investment Terms* 838 (9th ed. 2014).  "The VIX is determined by a complex formula
based on the assumption that, other things being equal, options will trade at higher prices

credited as the creator of the VIX—in which Whaley asserts that the most popular exchange-traded funds and notes tied to the VIX are "not suitable buy-and-hold investments" and are "virtually guaranteed to lose money through time." Brendan Conway, *VIX Creator: Volatility ETPs 'Virtually Guaranteed to Lose Money'*, Barron's Focus on Funds (Oct. 18, 2013), http://blogs.barrons.com/focusonfunds/2013/10/18/vix-creator-volatility-etps-virtually-guaranteed-to-lose-money/.[11] According to Plaintiffs, reading that story led to their efforts "to understand the mechanism and behavior of SRNs," and to their conclusion that BOA misled and defrauded them. (Doc. 1 ¶ 19.)

Plaintiffs' investment experience with the SRNs was poor. The court accepts as true for purposes of the Motion to Dismiss the claims that Plaintiffs invested a total of $250,909.70. (*See* Doc. 1 ¶¶ 13, 18.) In December 2014 Plaintiffs sold 3,500 units for $0.57 per unit. (*Id.* ¶ 37.) On June 16, 2015, Plaintiffs demanded rescission from BOA; BOA declined to respond. (*Id.* ¶ 20.) As of September 1, 2015 (the date of Plaintiffs' Complaint), the value of Plaintiffs' remaining 29,040 units was below one dollar per unit. (*See id.* ¶ 37.)[12] The maturity date for the SRNs was September 25, 2015. (Doc. 8-3 at 2.)

_____

when expected volatility rises." *Id.* "The VIX measures the 30-day implied volatility of the S&P 500® Index as calculated based on the prices of certain options on the S&P 500® Index." (Doc. 8-3 at 17.)

[11] The court may take notice of the story's publication. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters.").

[12] Inspection of the publicly available figures for the IVI reveals that, on September 1, 2015, the IVI closed at a level of 16.24 (a drop of approximately 94% from

**IV.     Statements and Disclosures in the Offering Documents**

**A.     The Three-Page Description of the IVI**

Before Plaintiffs invested in the SRNs, they received the three-page description of the Investable Volatility Index (Doc. 8-4).  (*See* Doc. 1 ¶ 11.)  That document described some of the benefits of investing in SRNs, including "diversification benefits" stemming from "[n]egative correlation to equities" and protection against "the risk of extreme equity market declines."  (Doc. 8-4 at 2.)  The document described the IVI as an index "designed to provide a benchmark for investing in equity market volatility."  (*Id.*)  It stated that "[o]n a historical basis, the Index has maintained consistently high negative correlation with the S&P 500® Index and performed best in periods of extreme equity market dislocation, in sharp contrast with many other assets."  (*Id.*)  In a section entitled "Index Mechanics," the document stated: "The Index measures the forward implied volatility of the S&P 500® Index for a three-month window centered approximately five months in the future, and the Index return reflects transaction costs associated with rolling a hypothetical position to maintain this exposure."  (*Id.*)

The document asserted that the Index could be used to "[h]edge an [e]quity [p]ortfolio": "On a historical basis, even small hypothetical allocations to the Index significantly improved performance by reducing risk and increasing risk-adjusted returns."  (*Id.* at 3.)  The following chart accompanied that assertion:

---

the Starting Value of 281.69).  *See* http://www.cboe.com/micro/vol (spreadsheet available by clicking "Historical Index Closing Levels").



**Allocation to the Index Has Potential to Improve Risk-adjusted Returns**

*Source: Bank of America Merrill Lynch Equity Derivatives. Data: 12/31/04 - 7/30/10. Weights are reset monthly and all hypothetical portfolios are set to $100 on 12/31/04. Index levels before 3/23/10 represent hypothetical results based on historical inputs. **Historical results may not be indicative of future performance.***

(*Id.*)  The S&P 500 Total Return Index ("SPTR") is the bottommost line at December 2008.  Above it appear the 90% line and on top the 80% line.

The chart shows the experience of investors who placed 10% and 20% of their portfolio in the IVI between December 2004 and June 2010.  This experience closely tracked the total S&P 500 return figures during market increases from December 2004 through late 2009.  The value of the portfolios stayed significantly above the total S&P 500 return during the bad year of 2008.  With the ensuing recovery, they began to track the S&P gains as before.  The document asserted that "[t]he Index may help to moderate a portfolio's return distribution, thus reducing the occurrence of large losses."  (*Id.*)

The three-page description of the IVI also included the following statement regarding risk factors:

10

> **Please note that there are risks arising from an investment linked to the Index, including but not limited to the following:**
> - The Index methodology includes features, including a deduction for transaction costs, and a multiplier of 1.2, that can reduce its level.
> - The Index and its components have limited historical information.
> - Changing levels of forward implied volatility of the S&P 500® Index may reduce the level of the Index.
> - The policies of the sponsor and calculation agent for the Index could result in changes to the Index which may impact its levels.
>
> **You should review the complete offering documents of any instrument linked to the Index for a more complete description of the risks and terms relating to that investment.**

(*Id.* at 4.)  The document also included a statement noting that BOA had filed a registration statement with the Securities and Exchange Commission ("SEC"), and advising investors to "carefully read the prospectus supplement and the prospectus in that registration statement" for more information.  (*Id.*)  The document indicated that the prospectus supplement and prospectus could be obtained on the SEC website or upon request.  (*Id.*)

## B.    The 21-Page "Primer"

Plaintiffs concede that, before they invested in the SRNs, they "may have" been provided with the 21-page "primer" entitled "Why invest in Volatility?" (Doc. 8-5).  (*See* Doc. 1 ¶ 11.)[13]  Like the three-page description of the IVI, the "primer" described volatility as a "powerful diversifier" and that it "offers crash protection."  (Doc. 8-5 at 2.)  The document explained:

> Volatility is fundamentally negatively correlated to equity returns and can provide investors with protection when they need it most—in sharply declining markets—as witnessed in Oct 2008 and May 2010.   Adding

---

[13] Elsewhere in the Complaint, Plaintiffs appear to state that the primer was in fact among the promotional material given to them before they purchased the SRNs on September 22, 2010.  (*See id.* ¶ 25 (listing the primer among "[t]he promotional material given to plaintiffs before the purchase of SRNs on September 22, 2010").)

> volatility to an equity portfolio would have historically provided significant diversification benefits, enhancing risk-adjusted returns . . . and reducing portfolio drawdowns.

(*Id.*) The document also noted that forward-volatility-based hedges "have a cost in exchange for the protection they provide" and that the volatility-based hedges "that offer the most benefit in tail events are also the most expensive to hold in quiet markets." (*Id.*)

The primer included a discussion entitled "Holding cost of forward is linked to term structure of implied volatility." (*Id.* at 6.) The primer states that "[w]hile investing in forward implied volatility circumvents paying the implied to realized volatility risk premium, there is still a holding (carry) cost for the protection offered by a long forward volatility position." (*Id.*) "This cost is linked to the implied volatility term structure, which represents the implied volatilities of options with different maturities." (*Id.*) According to the primer, "[s]ince Jan 1989, the S&P 500 implied volatility term structure has been upward sloping 84% of the time, though it can be significantly downward sloping in periods of market stress." (*Id.* at 7 (footnote omitted).) The primer goes on to state that shorter-dated forward implied volatility typically has a higher carry cost than longer-dated forward volatility, and that the carry cost associated with holding forward contracts on 1-month volatility, such as VIX futures, is "particularly large." (*Id.*)

The "primer" also included a section on "Risks to investing in volatility." (*Id.* at 19.) The first risk listed is that "[s]ignificant costs to owning volatility can accrue when the implied volatility curve is persistently steep and upward sloping or when the volatility risk premium (the difference between implied and realized volatility) is consistently high. Both can occur in a sustained equity market rally." (*Id.*) Other

disclosures in smaller print encouraged investors to seek financial advice, and noted that investing in derivatives involves "numerous risks" including "market risk." (*Id.* at 20.)

### C.   The Final Pricing Supplement

According to Plaintiffs, they were provided with the September 29 Supplement and the Final Pricing Supplement in October 2010—after they had made their initial $200,000 purchase. (*See* Doc. 1 ¶ 15.)  The 29-page Final Pricing Supplement (plus three-page appendix) describes the SRNs and the IVI in detail.  It includes a statement of "key features," summaries of the Index and risk factors, questions and answers about the investment, as well as more detailed descriptions of the Index and risk factors.  In the detailed description of the Index, the Final Pricing Supplement included the following chart:



(Doc. 8-3 at 20.)  According to the Final Pricing Supplement, the chart "compares the historical results of the Index versus the historical results of the S&P 500® Total Return Index ("SPTR") from December 31, 2004 to the pricing date." (*Id.*)  "The chart

illustrates the historical tendency for the level of the Index to increase during periods when the level of the SPTR is decreasing, and to decrease during periods when the level of the SPTR is increasing." (*Id.*)  The Final Pricing Supplement cautioned that "[t]his historical data is not indicative of the future performance of the Index or the SPTR, or what the value of the SRNs may be." (*Id.*)

The Final Pricing Supplement recommended consulting with advisors before investing in SRNs, and cautioned that "[i]nvesting in the SRNs involves a number of risks." (*Id.* at 2, 4, 10.)  The Final Pricing Supplement included a list of "Risk Factors," describing "General Risks Relating to the SRNs" as well as "Risks Relating to the Index."  The first "general risk" was as follows:

> **Your investment may result in a loss; there is no guaranteed return of principal.**  The SRNs are not principal protected.  We will not repay you a fixed amount of principal on the SRNs on the maturity date or upon exchange.  Instead, the Redemption Amount or the Exchange Amount will depend on the direction of and percentage change in the level of the Index, as well as the daily accrual of the Index Adjustment Factor.  Because the level of the Index is subject to market fluctuations, the Redemption Amount or the Exchange Amount may be more or less than the Original Offering Price of your SRNs.  As a result of the 2% sales charge reflected in the calculation of the Redemption Amount or the Exchange Amount, and due to the accrued Index Adjustment Factor, if the level of the Index has decreased or has not increased sufficiently (at maturity, by more than 5.93%), you will receive less, and possibly significantly less, than the Original Offering Price.

(*Id.* at 14.)  Another "general risk" was the caution that SRN investors needed to rely on their "own evaluation[s] of the merits of an investment linked to the Index." (*Id.*)

The risks related to the Index included the following.  "The historical performance of the Index is not an indication of its future performance." (*Id.* at 16.) "The Index and the Index Components have limited historical information." (*Id.*) Moreover:

> **The level of implied volatility of the S&P 500® Index has historically reverted to a long-term mean level and any increase in the level of implied volatility may be constrained.**  In the past, the level of the implied volatility of the S&P 500® Index has typically reverted over the longer term to a historical mean, and its absolute level has been constrained within a band.  It is possible that the spot level of the implied volatility of the S&P 500® Index will continue to do so in the future.  If this occurs, the level of forward-volatility, as reflected by the level of the Index, will likely decrease, reflecting the market expectation of reduced volatility in the future, and the potential upside of your investment in the SRNs will correspondingly be limited as a result.

(*Id.* at 17.)

> **Changing levels of forward implied volatility of the S&P 500® Index may result in a reduced amount payable at maturity or upon exchange.**  If the level of forward implied volatility is higher in the more distant S&P 500® Index options expiration months than it is in the nearer expiration months, then the level of the Index could be adversely affected as the Index positions are rebalanced daily to maintain a constant maturity.  The rebalancing involves increasing exposure to more distant forward implied volatility and decreasing exposure to more near-term forward implied volatility which may decrease the payment you receive at maturity or upon exchange.  Historically, the more distant expiration months have typically had a higher level of forward implied volatility than the nearer expiration months.

(*Id.*)

In a section entitled "Description of the SRNs," the Final Pricing Supplement states that "[t]he longer the term of your investment, the more the Index Adjustment Factor will accrue, and the more the level of the Index must increase in order for you not to lose a portion of your principal amount.  (*Id.* at 22–23.)  "If the level of the Index, as adjusted, has decreased or has not increased sufficiently, you will receive less, and possibly significantly less, than the Original Offering Price."  (*Id.* at 23.)

15

**ANALYSIS**

**I.     Standard of Review**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant

has acted unlawfully." *Id.*  In reviewing the sufficiency of a complaint, the court accepts

as true only the complaint's "factual allegations, and the reasonable inferences that can be

drawn therefrom." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014).  "[D]etermining

whether a complaint states a plausible claim is context-specific, requiring the reviewing

court to draw on its experience and common sense." *Iqbal*, 556 U.S. at 663–64.

Plaintiffs' fraud claims must also satisfy Rule 9(b)'s heightened pleading

standard: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other

conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  "In

essence, Rule 9(b) places two further burdens on fraud plaintiffs—the first goes to the

pleading of the circumstances of the fraud, the second to the pleading of the defendant's

mental state." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160,

171 (2d Cir. 2015).  Regarding the pleading of the circumstances, "the complaint must

'(1) detail the statements (or omissions) that the plaintiff contends are fraudulent,

16

(2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Id.* (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).  As to mental state, plaintiffs alleging fraud must "allege facts 'that give rise to a strong inference of fraudulent intent.'"  *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).

## II.    Plaintiffs' Securities and Exchange Act Claim

Plaintiffs assert federal securities claims and state-law claims for fraud, consumer fraud, negligence, and unjust enrichment.  Plaintiffs' principal claim is the securities-fraud claim under 15 U.S.C. § 78j (Section 10(b) of the Securities and Exchange Act of 1934) and 17 C.F.R. § 240.10b-5 (SEC Rule 10(b)-5).  Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).

SEC Rule 10(b)-5 implements § 10(b), declaring it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 240.10b-5.  The elements of a claim under § 10(b) are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of the security; (4) reliance; (5) economic

loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

### A.      Material Omissions

Initially, there is a dispute about which of the offering documents the court should consider when evaluating what BOA disclosed to Plaintiffs.  Plaintiffs suggest that, for the purposes of determining what was disclosed to them, the court should not consider either the September 29, 2010 Supplement and Final Pricing Supplement (Doc. 8-3) or the 21-page "primer" (Doc. 8-5).  They assert that, before their September 22, 2010 purchase of SRNs, they had received only the three-page description of the IVI (Doc. 8–4).  (*See* Doc. 9 at 5–6.)  BOA maintains that, in paragraph 25 of Plaintiffs' Complaint, they admit to receiving all three offering documents prior to their September 22, 2010 purchase.  (Doc. 14 at 13.)  BOA also contends that Plaintiffs are charged with knowledge of the publicly available offering materials.  (*Id.*)

The Complaint does appear to contain inconsistent statements about whether Plaintiffs received the 21-page primer prior to their purchase of the SRNs on September 22, 2010.  (*Compare* Doc. 1 ¶ 11 (asserting that Plaintiffs "may have" been provided with the primer before September 22, 2010) *with* ¶ 25 (listing the primer among "[t]he promotional material given to plaintiffs before the purchase of SRNs on September 22, 2010").)  Plaintiffs could not have received the September 29, 2010 Supplement prior to their September 22, 2010 purchase.  The Complaint appears to contain inconsistent statements about when Plaintiffs received the Final Pricing Supplement.  (*Compare* Doc. 1 ¶ 15 (asserting that Plaintiffs received the Final Pricing

Supplement in October 2010) *with* ¶ 25 (listing "prospectuses" among "[t]he promotional material given to plaintiffs before the purchase of SRNs on September 22, 2010").)

In any case, the September 29, 2010 Supplement and the Final Pricing Supplement were publicly available within days of Plaintiffs' September 22, 2010 purchase.  *See* Bank of America, SRN Linked to Investable Volatility Index Sticker [September 29, 2010 Supplement] (filed Sept. 30, 2010), *available at* http://www.sec.gov/Archives/edgar/data/70858/000119312510220708/d424b2.htm; Bank of America, Final Term Sheet No. 449 [Final Pricing Supplement] (filed Sept. 24, 2010), *available at* http://www.sec.gov/Archives/edgar/data/70858/000119312510216429/ d424b2.htm.  Moreover, Plaintiffs received those documents by October 2010, if not before.  (*See* Doc. 1 ¶ 15.)  Thus Plaintiffs could have reviewed those documents and, if they chose, exchanged their SRNs before experiencing any substantial losses.

In their Complaint, Plaintiffs set forth what they believe BOA should have included in the offering documents.  (*See* Doc. 1 ¶ 25.)  They assert that BOA should have disclosed: (1) that the "long term expected value of SRNs is zero"; (2) "the mechanism for the constant erosion of the principal invested"; (3) that "the data used to show the 'historic' performance of IVI was favorably manipulated"; and (4) that "because of erosion of capital, the potential for reduction of large losses is unrealistic." (Doc. 1 ¶ 25.)  Each of those alleged omissions relates to the effect of daily rebalancing on the level of the IVI over time.

BOA asserts that Plaintiffs' list of omissions would require BOA to "forecast future market conditions and performance."  (Doc. 8-1 at 19.)  It is true that the value of the IVI depends (in part) upon volatility, which in turn depends upon market conditions.

And BOA correctly notes that "'[i]t is not a material omission to fail to predict future market performance.'"  *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014) (quoting *In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644, 656 (S.D.N.Y. 2012))), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).  However, Plaintiffs claim that the level of the IVI—especially over the long term—largely depends on factors other than just volatility (or the performance of the financial markets).  These factors include rebalancing costs which form part of the structure of the IVI and in Plaintiffs' view ensure the long-term failure of the investment.

Concededly, it is possible to imagine an equities market that is so profoundly and consistently volatile over the course of five years that volatility overshadows all other factors influencing the levels of the IVI.  In this world, market performance would be the primary determinant of the level of the IVI.  However, BOA indicates in its own offering documents that such circumstances are historically rare.  (*See* Doc. 8-3 at 17 ("The level of the implied volatility of the S&P 500® Index has historically reverted to a long-term mean level and any increase in the level of implied volatility may be constrained.").)  The offering documents disclose with great thoroughness the risk that market conditions might not result in increased value for the SRNs.  The more difficult question is whether BOA should have disclosed more about how the IVI would perform under under the influence of at least two other factors both stemming from the rebalancing feature of the IVI: compounding and "contango."[14]

---

[14] The fee structure—described above—also impacts the value of the SRNs, but the fees cannot by themselves account for the kinds of losses that Plaintiffs allege.  The fees were also disclosed in detail in the offering documents.

### 1.      Compounding

Aside from the markets, one factor affecting the levels of the IVI is compounding. As BOA itself observes: if a security "declines in value by 50%, it must then rise by 100% to reach its opening level." (Doc. 14 at 9 n.4.)  The IVI is based on "Index Components"—from which it derives implied volatility levels.[15]  Those levels might revert to a long-term mean, but they will nevertheless be subject to some changes each day.  Under those conditions, the IVI will experience decay and decline in value because, for example, after each 1% decline in the level of the Index Components, a gain of *greater* than 1% is necessary to bring the IVI back up to its previous level.[16]

Plaintiffs allege that because the process of compounding or rebalancing occurs every day, the SRNs will sustain "an unrealized loss which in combination may result in the loss of as much as one-third of [the] principal investment in the first year." (Doc. 1 at 8, ¶ 25(b).)  The effect of compounding on their investment remains to be determined and is a matter for calculation by their expert witness.  For purposes of the Motion to Dismiss, the court accepts as true Plaintiffs' allegation that the compounding or rebalancing process resulted in substantial, undisclosed losses during each year they held the SRNs.

BOA does not contend that the offering documents disclosed any risk from compounding, but asserts that it is "self-evident" that if a security declines in value by 50%, then it must rise by 100% to reach its opening level.  (Doc. 14 at 9 n.4.)  That might

---

[15] The "Index Components" are implied volatility levels computed using the same formula used in calculating the VIX and "published on Bloomberg under the index symbols VXMAR, VXJUN, VXSEP, and VXDEC . . . for the implied volatility calculations in March, June, September, and December, respectively." (Doc. 8-3 at 18.)

[16] A somewhat more detailed explanation using a simple example appears in the Appendix, *infra*.

be so, but compounding is arguably more subtle and pervasive: it is the repeated application of that truth over a period of time which causes the damage. A small leak for a short time is inconsequential. A persistent leak over time will empty any bucket. Moreover, compounding is not the only force affecting the IVI as a result of daily rebalancing of the Index.

**2.     Contango**

A second factor affecting the levels of the IVI is contango. Contango is generally "[a] pricing situation in which the prices of futures contracts are higher the further out the maturities are." *Webster's New World Finance and Investment Dictionary* 74 (2003). Although they did not use the term "contango," the offering documents did disclose that the implied volatility markets are usually in that state. (*See* Doc. 8-5 at 7 ("Since Jan 1989, the S&P 500 implied volatility term structure has been upward sloping 84% of the time . . . ."); Doc. 8-3 at 17 ("Historically, the more distant expiration months have typically had a higher level of forward implied volatility than the nearer expiration months.").)

The documents also cautioned (in general terms) that those circumstances could adversely affect the level of the IVI:

> If the level of forward implied volatility is higher in the more distant S&P 500® Index options expiration months than it is in the nearer expiration months, then the level of the Index could be adversely affected as the Index positions are rebalanced daily to maintain a constant maturity. The rebalancing involves increasing exposure to more distant forward implied volatility and decreasing exposure to more near-term forward implied volatility which may decrease the payment you receive at maturity or upon exchange.

(Doc. 8-3 at 17.) Plaintiffs contend that the warning of a potential decrease in the payment at maturity greatly understates the likelihood and the probable extent of this

loss. (*See* Doc. 9 at 11 ("[T]he disclosure not made . . . was that the likely value of the SRNs **will** be zero long term.").)

Contango is like a rainy season. The investor may not get wet every day, but in the course of a month he will get soaked. The issue in this case is whether the above two aspects of the SRNs—decay over time and the predominance of higher futures prices—were adequately disclosed to Plaintiffs. The other factors which contributed to Plaintiffs' losses were the high fees and the rising equity markets. Those factors were disclosed in detail in the offering documents. It is not clear at this stage of the litigation whether Plaintiffs will be able to prove that the factors which were not fully disclosed (decay and contango) accounted for a substantial portion of their losses. Plaintiffs are entitled to a chance to prove this claim through expert testimony and other evidence.

### 3. *In re TVIX*

The court concludes that Plaintiffs have stated a plausible claim that BOA's disclosures contained material omissions. In making this statement, the court emphasizes that it cannot determine on the face of the Complaint and the offering documents whether the loss of value through daily compounding or rebalancing of the IVI was material in scope. The actual extent of the "decay" experienced through rebalancing is not set out in the Complaint and is more appropriately considered on summary judgment. But the court is obliged under Rule 12 pleading standards to give Plaintiffs an opportunity to develop their case in this regard.

*In re TVIX* is instructive on these issues. As in the case of BOA's SRNs, the investment product offered in that case (Exchange-Traded Notes or "ETNs") used a formula that was based on the value of futures contracts reported on the VIX. Like the

23

SRNs, the index underlying the ETNs had to be rebalanced every day. That rebalancing caused a daily magnification of losses and erosion of gains. *Id.* at 451. The plaintiffs brought suit under 15 U.S.C. §§ 77k and 77*o*, alleging that the offering documents were misleading insofar as they suggested "that a holding period longer than one trading session was appropriate." *Id.* at 448. The court concluded that the plaintiffs had failed to state a claim because the pricing supplement included "more than 25 plain English warnings concerning the risks of prolonged investments." *Id.* at 450. One such warning was that the ETNs were "not suitable for investors who intend to hold the notes for longer than one day." *Id.* at 450–51. Another warning was that "[t]he long term expected value of your ETNs is zero." *Id.* at 454.[17]

BOA does not deny that the daily rebalancing it performed to calculate the IVI magnifies losses and erodes gains over time. Instead, BOA attempts to distinguish *In re TVIX* on the grounds that the investment product in that case was leveraged. The ETNs were indeed "designed to offer a *leveraged* exposure to the VIX (specifically, two times the daily performance of the Index)." *Id.* at 447 (emphasis added). But the fact that the SRNs are not leveraged only prolongs their fate: a similar magnification of losses and erosion of gains resulting from daily rebalancing applies to the SRNs, just not as quickly as with the leveraged ETNs sold in the *TVIX* case.

The ETNs in *In re TVIX* are also different from the SRNs in another respect. The formula used in that case was designed "to track the performance of the S&P 500 VIX *Short-Term* Futures Index." *Id.* (emphasis added). The IVI, by contrast, was designed to offer exposure to "*medium-dated* forward volatility." (Doc. 8-5 at 8.) Thus the contango

---

[17] The issuer of the ETNs in the *TVIX* case ultimately prevailed because the offering documents included these warnings.

risk from rebalancing for the SRNs was arguably less than it was for the *TVIX* ETNs. (*See id.* at 7 ("Shorter-dated forward implied volatility typically has a higher roll-down cost (i.e., carry cost) than longer-dated forward volatility.").)

The differences between the ETNs in *In re TVIX* and the SRNs in this case demonstrate that the decay resulting from rebalancing is slower for the SRNs. But the same mechanisms are present in both cases. *In re TVIX* makes it clear that when the decay is so acute that it substantially impacts an index's levels over the course of a few days, a bank must include very explicit warnings, such as warnings that the investment is not suitable for investors who intend to hold for more than a day, and that the long-term expected value is zero.

In short, there are two structural elements built into the IVI which tend to erode investor value. One is the tendency of the IVI to sink towards zero because of the compounding each day of small percentage adjustments toward a mean of zero. Over time compounding works miracles for an investor in a simple deposit account. In this case, however, the same arithmetic process works in the opposite direction. Any small daily subtraction from the value of the original investment requires a slightly higher gain to overcome and regain the same position. If gains and losses on the underlying index are equal over time, the account loses value. *See* Appendix, *infra.*

The other structural element is more historical than arithmetic. During most periods of modern financial history—at least since 1989—futures price have been higher for positions further out in time. The reasons for this behavior may be the subject of debate by economists, but the empirical experience is not and it is referenced in the offering documents. (*See* Doc. 8-5 at 7 ("Since Jan 1989, the S&P 500 implied volatility

term structure has been upward sloping 84% of the time, though it can be significantly downward sloping in periods of market stress." (footnote omitted)); Doc. 8-3 at 17 ("Historically, the more distant expiration months have typically had a higher level of forward implied volatility than the nearer expiration months.").) Volatility—the rate of change in futures prices—occurs regardless of whether contango is present. In other words, the newest options to enter the Index—furthest away in time—will go up or down independent of the price of options which are three months older. But contango plays a role in diminishing investor value because new options entering the IVI calculation tend to be more costly than existing contracts. An account which is consistently "paying" a little more each day for the options it is adding to the index and "receiving" a little less for the options it is subtracting from the same index will lose money over time.

The central issue in this case is whether these two tendencies were present during the time the Flinns held the SRNs and whether their effect on the value of the investment can be seen as sufficiently substantial and economically significant to warrant disclosure in a more bold assertion than the rather bland statements provided in the offering documents. This is not a decision which the court can make on the face of the Complaint and the offering documents alone. The materiality of these two factors cannot be determined on the present record. Plaintiffs complain of decay in the value of their investment for reasons which received limited disclosure in the offering documents. The court has no record on which to determine the severity of the compounding and contango problems in the life of this particular derivative investment. Because all elements of the investment from the creation of the IVI to the daily calculation of the value of the Flinns' account is a matter of record, a financial expert may be able to form an opinion about the

significance of these two factors.  Whether these issues can be resolved through summary judgment or following a trial remains to be seen.  It is clear, however, that Plaintiffs have made out a plausible claim on the element of material omission.

**B.     Remaining § 10(b) Elements**

BOA asserts that Plaintiffs have failed to adequately allege scienter, arguing that Plaintiffs have alleged only that BOA had "legitimate business motives" to improve its economic prospects.  (Doc. 8-1 at 24.)  Plaintiffs maintain that their pleadings support a strong inference of fraudulent intent, arguing that BOA was reckless because it knew the SRNs would decline steadily over time, and because BOA knew of the disclosures like those in *In re TVIX*, yet still did not offer similarly robust disclosures for its SRNs.  (*See* Doc. 9 at 21–22.)

To adequately plead scienter, Plaintiffs must "allege facts giving rise to a 'strong inference that the defendant acted with the required state of mind.'"  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "This requirement can be satisfied by 'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Id.* (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).  "The inference of scienter must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* (omission in original; internal quotation marks omitted).

The court concludes that Plaintiffs have alleged facts giving rise to a sufficiently strong inference that BOA acted at least recklessly.  The disclosures that BOA did make revealed that BOA knew that the level of implied volatility of the S&P 500 Index has

27

historically reverted to a long-term mean level. The same disclosures reveal that BOA knew about the contango risk associated with rebalancing, and BOA arguably knew or should have known about the cost of the compounding. An additional allegation supporting a potential inference of scienter is BOA's failure to amend its disclosures after broad disclosures became public in the *In re TVIX* case.

BOA does not assert any failure by Plaintiffs to plead a connection between the alleged misrepresentation or omission and the purchase of the SRNs. Indeed, Plaintiffs specifically allege that a reasonable investor with knowledge of the decay caused by daily rebalancing would have declined to purchase the SRNs. (Doc. 1 ¶ 28.) That allegation is plausible, at least for a reasonable investor who was considering holding SRNs to maturity and who knew that the level of implied volatility of the S&P 500 Index historically reverted to a long-term mean.

BOA contends that Plaintiffs have failed to allege reasonable reliance. According to BOA, Plaintiffs had "extensive material" available to them, and failed to conduct "even minimal diligence" before investing in the SRNs. (Doc. 8-1 at 25.) Plaintiffs insist that the question of reasonable reliance is a question for the jury. (Doc. 9 at 23.) Generally, the evaluation of "reasonable reliance" involves many non-dispositive factors, and is often a question of fact for the jury. *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011). Those factors include:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993).

The court concludes that the reasonable reliance element in this case cannot be decided as a matter of law on BOA's Motion to Dismiss. It is true that "[a]n investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Brown*, 991 F.2d at 1032. BOA may be able to prove that Plaintiffs are relatively sophisticated in financial matters.[18] But one could reasonably conclude from Plaintiffs' pleadings that a greater degree of specificity was required in the offering documents because "minimal diligence" might have been insufficient for an investor to understand the magnitude of that risk for SRNs held to maturity.

BOA does not assert that Plaintiffs have failed to plead economic loss. In fact, Plaintiffs have pleaded that their original investments of more than $250,000 in the SRNs are now worth less than one-tenth that amount. (*See* Doc. 1 ¶ 37.) BOA does contend, however, that Plaintiffs have failed to plead loss causation. According to BOA, the extent of its disclosures prevents Plaintiffs from alleging that a concealed risk materialized and caused their alleged losses. (Doc. 8-1 at 25–26.) Plaintiffs maintain that BOA's argument on this point simply repeats its argument that its disclosures were adequate. (Doc. 9 at 23.) The court agrees: BOA's disclosures are plausibly inadequate for the reasons described above. Whether the rebalancing losses were the real cause of Plaintiffs' losses remains to be seen, but the allegation of non-disclosure of the factors discussed above is sufficient to meet Rule 12 standards.

---

[18] BOA makes a point of asserting in its Motion that Plaintiff Gloria Flinn is the former general counsel of a financial services company. (*See* Doc. 8-1 at 7.) That fact does not appear in the pleadings, and even if the court could consider it, the court's conclusion would not change for the reasons described below.

**III.    Whether Plaintiffs' Securities and Exchange Act Claim is Time-Barred**

Apart from its arguments about the elements of Plaintiffs' § 10(b) claim, BOA asserts that the claim is time-barred. (*See* Doc. 8-1 at 26.)  According to BOA, Plaintiffs "would have known all of the facts they could possibly need in September 2010, when Plaintiffs first purchased SRNs, and again in 2012, when they continued to invest . . . ." (*Id.*)  Plaintiffs maintain that the accrual of the statute of limitations is a question of fact for a jury. (Doc. 9 at 24.)

There is no dispute that a statute of limitations applies to § 10(b) claims.  Under 28 U.S.C. § 1658(b), such claims "may be brought not later than the earlier of— (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  Plaintiffs filed their Complaint on September 1, 2015.  If Plaintiffs, exercising reasonable diligence, "discovered" (or would have discovered) the facts constituting the alleged violation in 2010 or even as late as 2012, then their § 10(b) claim is time-barred.  "[T]he limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011).  "[T]he reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive as 12(b)(6) motion to dismiss." *Id.* at 175.

Here, a factfinder could conclude that a reasonable investor would not have even begun investigating the sufficiency of BOA's disclosures until she read the October 18,

2013 *Barron's* story or something like it.[19]  Even in March 2012—when the value of the

initial SRNs had dropped by 65%—the investor might have concluded that the losses

were caused by market conditions rather than any feature of the computation of the IVI.

## IV.    Plaintiffs' State-Law Claims

All of BOA's arguments seeking dismissal of Plaintiffs' state-law claims rest on

BOA's contention that Plaintiffs have failed to state a claim under § 10(b).  (*See* Doc. 8-1

at 27–29.)  Because the court concludes that Plaintiffs' § 10(b) claim survives BOA's

Motion to Dismiss, the court declines to dismiss Plaintiffs' state-law claims.

### Conclusion

For the above reasons, Bank of America's Motion to Dismiss (Doc. 8) is

DENIED.

Dated at Rutland, in the District of Vermont, this 30 day of March, 2016.

_____
Geoffrey W. Crawford, Judge
United States District Court

---

[19] BOA points out that the *Barron's* story concerns short-term exchange-traded
notes linked to the first volatility index, not the SRNs, which BOA says are medium-term
notes. (Doc. 8-1 at 25 n.8.)  The court is not considering the *Barron's* story here for the
truth of its contents.  In any case, as described above, it appears that the SRNs do indeed
behave somewhat differently than the notes mentioned in the *Barron's* story.  However,
as described above, the SRNs share mechanisms similar to those other vehicles.  Those
similarities make Plaintiffs' claim plausible.